NORFOLK & W. RY. CO. v. UNITED STATES.

(Circuit Court of Appeals, Fourth Circuit. October 14, 1911.)

No. 1,007.

1. EVIDENCE (§ 195*)—USE OF MODEL—ILLUSTRATION.

In an action by the United States against a railroad company for vio-lation of the safety appliance act (Act March 2, 1893, c. 196, 27 Stat. 531 [U. S. Comp. St. 1901, p. 3174]), in operating a car with a defective

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

coupler, it was not error to permit a witness in giving his evidence to use a model of a slightly different coupler not introduced in evidence as illustrative of the condition of the coupler in question.

[Ed. Note.—For other cases, see Evidence, Cent. Dig. § 680; Dec. Dig. § 195.*]

2. RAILROADS (§ 254*)—PENALTIES—EVIDENCE.

In an action for penalty for hauling a car with a coupler chain so kinked that it was necessary to go between the cars to operate the same, a question asked of a government inspector on cross-examination as to whether on another occasion he had not found a chain that appeared to be kinked in the coupler head, which, after being shaken by the lever, held the pin in proper position, and the witness then stated that it seemed to be all right, was properly excluded as irrelevant.

[Ed. Note.—For other cases, see Railroads, Dec. Dig. § 254.*]

3. RAILROADS (§ 254*)—SAFETY APPLIANCE ACT—GOVERNMENT RULES.

Where government inspectors had inspected the railroad car in question to secure evidence of violation of the safety appliance act (Act March 2, 1893, c. 196, 27 Stat. 531 [U. S. Comp. St. 1901, p. 3174]), department rules requiring that all inspections except those intended to secure evidence of the violation of the law shall be made after notice to the foreman or other official of the mechanical department of the railroad company, or, in his absence, to the agent or other employé next in authority, etc., were inadmissible.

[Ed. Note.—For other cases, see Railroads, Dec. Dig. § 254.*

Duty of railroad companies to furnish safe appliances, see note to Felton v. Bullard, 37 C. C. A. 8.]

4. RAILROADS (§ 229*)—SAFETY APPLIANCE LAW—INFORMATION TO RAILROAD COMPANIES.

A government inspector, examining railroad cars used in interstate commerce to ascertain whether the railroad company is complying with the safety appliance act (Act March 2, 1893, c. 196, 27 Stat. 531 [U. S. Comp. St. 1901, p. 3174]), is under no legal obligation to inform the railroad company of defective cars.

[Ed. Note.—For other cases, see Railroads, Dec. Dig. § 229.*]

5. TRIAL (§ 260*)—REQUESTED CHARGE—INSTRUCTIONS GIVEN.

In an action to recover a penalty for violation of the safety appliance act (Act March 2, 1893, c. 196, 27 Stat. 531 [U. S. Comp. St. 1901, p. 3174]), an instruction that, if the uncoupling chain on the car in question was so kinked in the coupler head that with reasonable effort a man could not operate the uncoupling apparatus on that end of the car without going between the ends of the cars, then the car was not in the condition required by law, and, if the jury found from a preponderance of the evidence that the car was hauled in such described condition, they should answer the issue yes, properly covered a requested charge that, if there was a mistake of fact as to the basis of the government's claim, defendant was entitled to recover.

[Ed. Note.—For other cases, see Trial, Cent. Dig. §§ 651–659; Dec. Dig. § 260.*]

6. TRIAL (§ 260*)—REQUESTED CHARGE—INSTRUCTIONS GIVEN.

In an action to recover a penalty for violating the safety appliance act (Act March 2, 1893, c. 196, 27 Stat. 531 [U. S. Comp. St. 1901, p. 3174]), the court charged that if the car in question was used in interstate commerce, but before starting on its interstate journey, after being loaded, it was carefully inspected and the coupling apparatus was not out of repair, and the uncoupling chain was not kinked inside the coupler head, then the jury should find for defendant, that, while the testimony of defendant's witnesses that the car was inspected on its journey was not of itself substantive evidence as to the condition of the car when it left D., yet it was competent to corroborate the testimony of defend-

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

ant's car inspector, who testified that he inspected the car at D., and that the chain was not kinked in the head. of the coupler, nor out of repair at that time. *Held*, that such instruction covered a requested charge that though the chain was kinked at the time the train was being made up at D., and before it left the yards, yet, if the kink had been loosened before the train pulled out, the verdict should be for defendant.

[Ed. Note.—For other cases, see Trial, Cent. Dig. §§ 651–659; Dec. Dig. § 260.*]

7. RAILROADS (§ 229*)—SAFETY APPLIANCE ACT—DUTY OF RAILROAD COMPANY.

The duty of a railroad company to provide cars operated in interstate commerce with automatic couplers, so that they may be coupled and uncoupled without operatives going between the ends of the cars, and to keep such coupling apparatus in operative condition, as required by Safety Appliance Act March 2, 1893, c. 196, 27 Stat. 531 (U. S. Comp. St. 1901, p. 3174), as amended by Act March 2, 1903, c. 976, 32 Stat. 943 (U. S. Comp. St. Supp. 1909, p. 1143), is not performed by an exercise of a high degree of care and diligence in keeping and maintaining the appliances in proper condition and repair so far as by reasonable inspection from time to time it can be reasonably done.

[Ed. Note.—For other cases, see Railroads, Dec. Dig. § 229.*]

In Error to the District Court of the United States for the Eastern District of North Carolina, at Raleigh.

Action by the United States against the Norfolk & Western Railway Company. Judgment for plaintiff, and defendant brings error. Affirmed.

This is an action in debt begun by the United States to recover a penalty of $100 incurred by the defendant in hauling a car not equipped as provided in the safety appliance act of March 2, 1893, as amended by an act approved March 2, 1903. The petition charged, in substance, that the defendant was a common carrier engaged in interstate commerce by railroad, and as such, on August 28, 1908, hauled on its line of railroad one car, to wit, its own No. 20370, containing interstate traffic, to wit, tobacco consigned to a point without the state of North Carolina. It further alleged that on said date the defendant hauled said traffic in said car from Durham, in the state of North Carolina, in a northerly direction, when the coupling and uncoupling apparatus on the "B" end of the car was out of repair and inoperative, the uncoupling chain being kinked inside the coupler head on said end of said car, thus necessitating a man or men going between the ends of the cars. The defendant answered and admitted that it was a common carrier engaged in interstate commerce, and that it hauled car N. & W. 20370 on the date alleged from Durham, in the state of North Carolina, and that this car was used in the movement of interstate traffic, but denied that the coupling and uncoupling apparatus on the "B" end of the said car was out of repair and inoperative as alleged in the petition. On May 31, 1910, there was a trial of this case before a jury on the following issue: "Was the coupling chain on the 'B' end of N. & W. car No. 20370 kinked in the head of the coupler when said car left Durham, N. C., on August 28, 1908, and inoperative so that it required a man or men to go between the cars to couple and uncouple it, as is alleged in the petition?" The finding of the jury was in the affirmative, upon which finding judgment was entered against the defendant in the sum of $100.

William A. Guthrie (Theodore W. Reath, on the brief), for plaintiff in error.

H. F. Seawell, U. S. Atty., and Philip J. Doherty, Sp. Asst. U. .S. Atty. (Roscoe F. Walters, Sp. Asst. U. S. Atty., on the brief), for defendant in error.

Before GOFF and PRITCHARD, Circuit Judges, and ROSE, District Judge.

PRITCHARD, Circuit Judge (after stating the facts as above). [1] The first assignment of error is to the effect that the court below erred in allowing the plaintiff the use of models of the Climax and Tower couplers as a means of demonstrating his evidence while the government witness Cash was being examined concerning the condition of the Major coupling, the kind with which the car in question was equipped. The model in question was used merely for the purpose of aiding the court and the jury in ascertaining as to whether there was any defect in the coupler, and it was admitted by the government that this model was not exactly like the coupler attached to the car in question. It was not introduced in evidence, but the court permitted the use of the same to illustrate the condition of the coupler just as maps and drawings are used in the trial of ejectment suits. It was contended by the government that the chain was kinked in the coupler head, but there was no complaint as to the lock block. Mr. Cash, while on the witness stand, among other things, testified as follows:

"Q. By means of this model you may explain to the court and the jury just what condition you found the coupling apparatus on the 'B' end of this car. A. We haven't here a Major coupler, but one of these is known as the Climax and the other the Tower. The Major coupler is made more on this order, on the order of the coupler [indicating] and the chain had gotten kinked in this position [indicating] in such a way that you couldn't get it far enough either way to get it out, and it was perfectly rigid."

Thus it will be seen that this model was used solely for the purpose of illustrating the exact condition of the chain at the time the inspection was made. Where, in a trial like the one at bar, there is a question as to complicated machinery, it is competent to use any model or drawing that may illustrate the condition of such machinery so as to give the jury a clear and distinct idea as to the nature and character of the defect in order that they may intelligently deal with the question that is submitted for their consideration. 1 Wigmore on Evidence, § 791, contains the following statement as to the rule:

"The use of models, maps, and diagrams as modes of conveying a witness' knowledge is illustrated in manifold rulings, as well as in the daily practice of trials, citing an instance in a trial in an English court. Watson's Trial, 32 How. St. Tr. 125."

Also in the following cases this rule is announced: Western Gas Company v. Danner, 97 Fed. 892, 38 C. C. A. 528; Southern Pacific Company v. Hall, 100 Fed. 760, 41 C. C. A. 50; Dobson v. Whisenhant, 101 N. C. 645, 8 S. E. 126. We think the action of the court below in permitting the use of models merely for the purpose of illustration was not prejudicial to the rights of the defendant.

[2] The second objection is to the effect that the court below erred in sustaining the objection of counsel for the government to the following question put to the government inspector, Cash, on cross-examination:

"I ask you if on one of your visits (to Lynchburg yards) on an inspection tour you did not find a car where the chain appeared to be kinked in the

coupler head, and if you were not about to take a note of it when Mr. Clark and his assistant, Mr. Wingfield (the company's inspector), who were present on the yard, and if Mr. Clark did not take hold of the lever and by the lever alone shake the pin or chain that held the pin in proper position, and you did not thereupon say, 'This seems to be all right'—not this particular car in question, but on another car?"

This evidence, it appears, relates to a time and place different from that alleged in the declaration, and we cannot understand upon what theory it could have been offered as having any bearing whatever upon the issues involved in this controversy. In the first place, there is nothing to indicate what would have been the witness' answer, but in any event this testimony would not be competent. The witness was being cross-examined, and it was purely within the discretion of the court as to whether he should be required to answer the question, inasmuch as it did not tend to throw light upon the issues raised by the pleadings, and we think the court very properly excluded the same.

[3] The next point relates to the refusal of the court to permit the defendant to introduce a pamphlet marked "A. H. G. C." containing the rules of the department upon the examination of witness Cash. That portion of the rules offered as evidence is in the following language:

"I. In all inspections except in those intended to secure evidence of violation of the law, the inspector should make himself known to the foreman or other official of the mechanical department or in the absence of that officer, to the agent or other employé next in authority. In all cases have name and title of such officer or employé included in report of inspection. Whenever practicable the official found in charge should be invited to accompany or send a representative with the inspector, and the person so accompanying the inspector should have his attention drawn to all defects noted. The time of making inspections is to be shown on each report. * * *

"The object of those instructions is to call the attention of inspectors to certain rules to be observed in obtaining evidence upon which the government can successfully prosecute. Inspectors should enter upon the investigation of every case in a spirit of fairness and with a desire to perform their whole duty as officials of the government, directed to aid in the execution and enforcement of the law."

It is provided by the foregoing that in any inspection, except those intended to secure evidence of violation of the law, that the inspector should make himself known to the officer in charge, or, in the absence of the agent, the next official in authority, and, whenever practicable, the official found in charge should be invited to accompany or send a representative with the inspector so as to have his attention called to any defects and the same noted. The next paragraph is explanatory of this rule, and, among other things, it is stated therein that the inspectors must observe the rules under which they operate and enter upon every investigation with a spirit of fairness and a desire to perform their whole duty as officials directed to aid in the execution and enforcement of the law.

The real issue, as we have stated, in this case is as to whether the defendant violated the law by hauling over its road one of its cars the coupler of which was in defective condition. It should be borne in mind that at this time the witness was engaged in the performance of his duties at Durham, and was endeavoring to secure evidence of vio-

lation of the law, and the exception to the rule is to the effect that in such cases he is not required to make himself known. The witness testified that on that occasion he was seeking evidence of violation of the law, and, inasmuch as the evidence shows that the work in which he was engaged at that time brought him clearly within the exception of this rule, we fail to see how the rule and the instructions proposed to be introduced could have had any bearing upon the issue raised by the pleadings. Witness Cash, among other things, testified as follows:

"Q. What was the purpose of your going to the yard of the Norfolk & Western that morning? A. To see whether or not the Norfolk & Western was complying with the safety appliance law with reference to their equipment."

Inspector Cullinane also testified as follows:

"Q. When you and Mr. Cash went there (to Durham, N. C., on August 28th, 1908), you were making a general visitation to see whether or not you could find any violation of the safety appliance law? A. Yes, sir."

Thus it clearly appears that the inspectors were acting strictly within the scope of their authority. Therefore the admission of this evidence would not have been competent in any view of the case—not even for the purpose of impeaching the witness. He testified that they were looking for violations of the law, and, as we have stated, the rule clearly provides that in such cases the inspector is not required to disclose his identity. Therefore we think the ruling of the court below as to this point was eminently proper.

[4] It is also insisted that the court below erred in granting an instruction, at the request of counsel for the government, to the effect that the government inspector was under no legal obligation to inform the railroad company of defective cars. Congress by the enactment of the statute, by virtue of which this suit was instituted, evidently intended to hold the railroad companies to a high degree of diligence in equipping and maintaining their cars with the proper safety appliances. If it is the intention of the law that when an inspector goes from place to place, and when he finds a car in a defective condition that it is his duty to notify the company of the same before the car is transported, then it would be impossible to secure anything like a fair enforcement of the law which penalizes the railroads for not properly equipping and maintaining their cars with safety appliances.

In the case of United States v. Atchison & S. F. Railway Company, Kent's Index-Digest, 125, the court said:

"Inspectors in the employ of the Interstate Commerce Commission are not required to inform the employés of the defendant, when they make the inspection of the cars sued upon, of the defects found in the appliances."

Also in the case of the United States v. Chicago Great Western Railway Co. (D. C.) 162 Fed. 775, the court said:

"The inspectors for the government are not required to notify the employés of the railroad company of existing defects previous to or at the time of movement of defective cars sued upon of the defects found in the appliances."

Under the circumstances of this case, and in view of the requirements of the statute, we think the court did not err in granting this instruction.

[5] It is also urged that the court erred in refusing to grant instruction No. 2, requested by the defendant. The instruction in question is in the following language:

"If there is a mistake of fact as to the basis of the charge, the defendant is entitled to recover."

In this instruction no particular fact is referred to as having any hearing upon the controversy that was then being considered by the jury. It is simply an abstract proposition of law unaccompanied by any explanation as to its relevancy to the facts then being considered by the jury. However, the court submitted to the jury an instruction, which, though not in the same words, substantially covered the point sought to be raised by the instruction offered by the defendant. This instruction reads as follows:

"You are instructed that, if the uncoupling chain on the 'B' end of the car N. & W. 20370 was so kinked in the coupler head that with reasonable effort a man could not operate the uncoupling apparatus on said end of said car without going between the ends of the cars, then such car was not in the condition required by law. If you believe from a preponderance of the evidence that said car was hauled out of Durham, in the state of North Carolina, on August 28, 1908, in such above described condition, then it is your duty to answer the issue 'Yes.'"

Here the court instructed the jury as to what constituted a violation of the law, and further informed them that, if they failed to find as a fact by a preponderance of the evidence that the car in question was hauled out of Durham at the time mentioned in the petition, in a defective condition, it was their duty to answer the issue in favor of the defendant. The point sought to be presented in the prayer as requested by the defendant was substantially covered in the general charge of the court to the jury. It has been repeatedly held that where the court refuses a prayer, and then in its general charge or in another prayer covers the point in question, even though the court erred in refusing the prayer, that such error was not prejudicial, and therefore harmless.

[6] It is contended by the defendant that the court erred in refusing to give instruction No. 8, which is in the following language:

"The court further charges the jury that even though you find from the evidence that the chain was kinked in the coupler at the 'B' end of N. & W. car No. 20370, on the yard of the defendant at Durham at the time the train was being made up and before it left the yard, and while the government inspectors found it and inspected it, yet, if the kink in the chain had become loosened and unkinked and righted before the train pulled out of the yard and left for Lynchburg, then your verdict should be in favor of the defendant railway company, and you should answer the issue accordingly."

The question raised by this instruction was sufficiently covered by instructions Nos. 4 and 5 of the defendants, which the court had already granted. These instructions are as follows:

"That if the jury find from the evidence that N. & W. car No. 20370, described in the petition and admitted in the answer, was used in interstate

commerce, but before starting on its interstate journey after being loaded at Durham, N. C., with tobacco consigned to Norfolk, Va., it was carefully inspected at Durham, N. C., by a competent railroad coupler inspector employed by the defendant railroad company for that purpose, and the coupling and uncoupling apparatus on the 'B' end of the car was not out of repair and was not inoperative, and the uncoupling chain was not kinked inside the coupler head on said end of the said car, then the jury should answer the issue joined in favor of the defendant, and acquit the defendant of the charge.

"That while the testimony of the defendant's witnesses who were car inspectors at Lynchburg, Va., and who testify that said N. & W. car No. 20370 was inspected on its aforesaid journey from Durham, N. C., via Lynchburg, Va., to Norfolk, Va., it is not by itself substantive evidence as to the condition of the car when it left Durham, N. C., yet it is admitted as competent evidence to be duly considered by the jury tending to corroborate the testimony of the defendant's witness, Car Inspector S. D. Johnson, who testified that he inspected this car at Durham, N. C., on the occasion complained of, and that the coupler chain was not kinked in the head of the coupler, nor out of repair or inoperative."

[7] It is also contended that the court erred in refusing to grant the instruction which raised the question as to the degree of diligence required to be exercised by railroad companies to constitute a compliance with the safety appliance acts. The instruction in question is in the following language:

"But after a railroad company has performed such duty and equipped its cars with such automatic couplers, while the law requires the railroad company to exercise a high degree of care and diligence in keeping and maintaining such safety appliance in proper condition and repair, so far as by reasonable inspection from time to time it can be reasonably done, the law does not impose upon a railroad company the duty of an absolute insurer as to the perfect condition of such safety appliances at all times and under all conditions and circumstances."

This point was decided by the Supreme Court in the case of St. Louis & Iron Mountain Railway Company v. Taylor, 210 U. S. 281, 28 Sup. Ct. 616, 52 L. Ed. 1061, also by this court in the cases of the Atlantic Coast Line Railroad Company v. United States, 168 Fed. 175, 94 C. C. A. 35, and the Norfolk & Western Railway Company v. United States, 177 Fed. 623, 101 C. C. A. 249. In the case of the Atlantic Coast Line Railroad Company v. United States, this court, in referring to this phase of the question, said:

"To sustain the contention of the defendant company as to the proper construction to be placed upon the provisions of this act would be to render the act nugatory, while, on the other hand, if we construe it in accordance with the well-established rules in such cases, we afford life and vitality to the law and thus give expression to the legislative will. In other words, if Congress had the power, in the first instance, to legislate so as to regulate the conduct of railroads for the protection of employés and in the interest of the traveling public, then it must be admitted that it has not, in the passage of this law, transcended its limitation, and any construction short of holding the act to be absolute would leave undisturbed the situation as it existed prior to its enactment, and it would be difficult to imagine a state of facts upon which railroads would be liable for a penalty or where an employé would be able to recover in an action instituted to recover damages for injuries incurred on account of failure to perform the duties imposed by the statute. It was the manifest intention of Congress, in the enactment of this statute, to require all common carriers engaged in interstate commerce to keep their cars and engines at all times equipped with proper safety appliances. The degree

of diligence required by the statute is of the highest order, and the duty thus imposed is absolute and unconditional. Therefore any failure on the part of a railroad company to comply with its requirements must necessarily subject the railroad company to the penalty imposed."

The foregoing is in harmony with the recent decision of the Supreme Court in the cases of E. M. Delk v. St. Louis & San Francisco Railroad Company, 220 U. S. 580, 31 Sup. Ct. 617, 55 L. Ed. 590, and the Chicago, Burlington & Quincy Railroad Company v. United States, 220 U. S. 559, 31 Sup. Ct. 612, 55 L. Ed. 582, decided May 15, 1911, expressly affirming the rule announced in the case of St. Louis & Iron Mountain Railway Company v. Taylor, supra.

For the reasons stated the judgment of the lower court is affirmed.