## UNITED STATES v. LOUISVILLE & J. BRIDGE & R. CO.

(Circuit Court of Appeals, Sixth Circuit. June 30, 1924.)

No. 4002.

Railroads ⬅️229—Manner of return by terminal company of defective car held not violation of Safety Appliance Act.

Where a terminal company, which received in its yard cars for transfer to other roads, had placed in its yard by a railroad company, with others, a car with a defective running board, the retention of such car until other cars to be transferred to such company had accumulated, and then returning it with them, *held* not a violation of Safety Appliance Act, § 2 (Comp. St. § 8618).

In Error to the District Court of the United States for the Western District of Kentucky; Walter Evans, Judge.

Action by the United States against the Louisville & Jeffersonville Bridge & Railroad Company. Judgment for defendant, and plaintiff brings error. Affirmed.

M. C. List, Sp. Atty., for Interstate Commerce Commission, of Washington, D. C., and Claude Hudgins, Asst. U. S. Atty., of Louisville, Ky. (W. Sherman Ball., U. S. Atty., of Louisville, Ky., and J. O. Tolbert, Sp. Asst. U. S. Atty., of Washington, D. C., on the brief), for the United States.

Churchill Humphrey, of Louisville, Ky. (Edward P. Humphrey and Humphrey, Crawford & Middleton, all of Louisville, Ky., on the brief), for defendant in error.

Before DENISON and DONAHUE, Circuit Judges, and TUTTLE, District Judge.

---

DENISON, Circuit Judge. Section 2 of the Safety Appliance Act (36 Stat. 298 [Comp. St. § 8618]), provides that "it shall be unlawful for any common carrier subject to the provisions of this act to haul, or permit to be hauled or used on its line any car subject to the provisions of this act not equipped with appliances provided for in this act, to wit: All cars must be equipped with ٴ * * secure ٴ ٴ ٴ running boards." Section 4 (sec. 8621) contains the proviso that "where any car shall have been properly equipped ٴ ٴ ٴ and such equipment shall have become defective or insecure while such car was being used by such carrier upon its line of railroad, such car may be hauled from the place where such equipment was first discovered to be defective or insecure to the nearest available point where such car can be repaired ٴ ٴ ٴ if such movement is necessary to make such repairs." The defendant in error, the defendant in the penalty action brought in the court below by the United States, is a terminal company operating in Louisville, in the regular course of its business, receiving in its yard cars delivered there by the Illinois Central Railroad, and taking from its yard and delivering in the Illinois Central yards cars from other roads destined for that road. The two yards lie side by side, separated by a single street, though it is necessary, in order to get a cut of cars from either yard to the other, to run barely out of the first yard, over a switch located at one edge of this intervening street, and out onto the main track of another railroad, which main track is at right angles to this intervening street, until the rear car of this cut has passed the switch and is upon the main track; then to close this switch and back the cut of cars upon this main track until the engine at the front has passed the switch at the other edge of this intervening street; and then this switch is opened and the cut of cars passes from the main track into the second yard. If an engine alone were making this transfer, its travel, between the two yards, would not be over 150 feet; but, since there are three motions past the same spot, this distance is increased by the length of the train being handled, multiplied by two. The movement thus described, and involved in this case, is precisely the same movement described and considered by the Supreme Court in Louisville Bridge Co. v. U. S., 249 U. S. 534, 39 Sup. Ct. 355, 63 L. Ed. 757.

At about midnight of one day the Illinois Central pushed in upon the Terminal Company's interchange track a cut of some 20 cars to be transferred by the Terminal Company to other roads. Upon inspection by the Terminal Company within an hour or two thereafter, one was found to have a defective running board. It was at once marked with a placard showing that it was in bad order and that it was to be returned to the Illinois Central. It was then set out upon some adjacent track, where it remained until about noon of the next day. In the meantime, other cars in good order and destined for the Illinois Central had been accumulated upon the same track for the regular daily delivery of cars destined for that road. Thereupon the engine of the Terminal Company took this cut of cars, including the bad order car, and delivered them in the manner described to the Illinois Central yards across the street.

Upon the theory that this movement of this car was a violation by the Terminal Company of the Safety Appliance Act, this action was brought to recover the statutory penalty. The defendant prevailed. The facts were undisputed, and all parties agree that it is a matter of law whether the defendant is or is not liable. It is perhaps a natural thought that to move a car only as defendant did is not "to haul on its line" the car so moved; but this thought is expressly denied by the Supreme Court, in the case above cited, and that suggestion must be discarded.

It is quite clear that the hauling thus done was not within the letter of the proviso of section 4, since this only contemplates cases where the equipment became defective on the line of that carrier which is seeking to justify hauling to a repair shop under that proviso. In any such case as this, it must be the duty of the receiving carrier to reject the car; and only by such rejection can it keep out of a hopeless dilemma, as was pointed out by this court in B. & O. S. W. v. U. S., 242 Fed. 420, 424, 155 C. C. A. 196. However, this privilege of rejection must rest on a practical basis. It is manifestly impossible to quarantine a whole train at a connecting switch, until the cars are successively inspected and they are allowed, one by one, to pass over. We have no doubt that the inspection and rejection had in this case were a prompt and sufficient exercise of the privilege. The only question is as to what should have been done next.

There were four physically possible courses of action. The first was for the Terminal Company to repair the car where

it stood, without moving it. This would block all operation of the interchange track during the period of repairs. In this instance, that period would have been from 2 to 7 hours; in another case, that period might be 24 hours; or, in still another, such repairs might be impossible. Plainly, in the absence of imperative statutory direction, this course of action cannot reasonably be required.

The second was for the Terminal Company to haul the car to its own repair shops and there remedy the defect. In this instance, the haul would have been short; in another case, it might be long; but, if B. & O. S. W. v. United States, supra, was rightly decided, this method is forbidden.

The third was for the Terminal Company to set the car aside on some available track, notify the Illinois Central to come and get it, and let the car alone until it was sent for and taken away. This course was permissible under our construction of the statute in the B. & O. S. W. Case; but it may have practical objections almost insuperable. In a small yard, such as this was, it would be an obstacle and might require frequent shifting; perishable goods might spoil, leading to litigation; and it would be difficult to get any compensation for the use of the tracks or for other damages. We cannot think that this was the only kind of the permissible "mere incidental handling" contemplated by our former decision.

The fourth was for the Terminal Company itself to return the car to the Illinois Central. If the switch or yard tracks of the two railroads directly connected, such a return would be simple, and no one would doubt that it was permissible. The principle is not changed by the relatively trifling intermediate haul required by the circumstances of this case. There was no way of completing the rejection by a return except in the manner adopted. It is not clear that any permission could be found in the proviso for the Illinois Central to go away from its own tracks and get a defective car and haul it over the lines of two other railroads back to its own repair shop; but even if this movement could be justified under the literalness of the statute with a little less liberality of construction than is requisite to allow the movement which did take place, yet the two are, in substance, and in their relation to the purposes of the statute, precisely the same. It can make no difference to the safety of the brakeman who might be called upon to pass along this broken running board whether the handling was done by one railroad or the other. Statutory niceties aside, there is no appealing reason why one railroad should be penalized for a car movement that would have been lawful if by another road. Nor is it of controlling importance in this case that the car was not returned by itself, but rather in connection with other cars going to the Illinois Central. The statute which forbids hauling a defective car coupled to revenue cars—the last proviso of section 4—refers only to those cars which are compelled to use chains in place of draw bars (Erie R. R. v. U. S. [C. C. A. 6] 240 Fed. 28, 32, 153 C. C. A. 64), and hence is immaterial; but we are considering the practical limits of that "mere incidental handling of such car by the receiving carrier refusing to accept it" which may sometimes be essential to an effective rejection, and which is, therefore, then ex necessitate an exception to the universality of the prohibition. Doubtless, such limits must not be extended beyond the real necessity; and we assume, without deciding, that, in the usual case, the rejecting carrier, if it must redeliver the defective car, ought to haul it by itself and with the minimum possible handling. Under the special facts here found, we are not persuaded that the course which was taken is subject to condemnation on this account. True, if the Terminal Company engine had taken back this car alone, the probability of use of the running board by a brakeman would have been reduced to a minimum; but the "train" which was in fact taken across, was required to be power brake controlled, so as to eliminate any resort to hand brakes (Louisville Co. v. U. S., supra) and use of the running board would have been unlikely for that purpose. Further, every time there was any transfer between these two yards it was necessary to run out on the main line of another road (249 U. S. at page 537 [39 Sup. Ct. 355]), get the permission of that road, and have its officers block its trains in both directions from the section to be used for the transfer. To obtain the use of this main line track for the transfer of a single car would not only have been difficult or impossible, but, as compared with the course which was taken, such separate movement of a single car, added to the similar train movement which was to occur regularly in a few hours, would have doubled all the risks for all the roads concerned in the main track use, which main track risks were regarded by the Supreme Court in the former case as an important ele-

ment in determining the right procedure. It is still further to be observed that if it was the statutory right of the Illinois Central to haul this car to its own repair shop, as the government says should have been done, it might have hauled it in this train with other cars, since coupling chains were not required; and so, in all matters of risk pertinent to the general purposes of the act, this permitted movement would have been equivalent to the one actually had. If the Terminal Company had returned the car by itself 4 or 5 hours before, it might be contended that such transfer and use of switch and main tracks were not reasonably essential to that effective rejection which is permitted, and this because a little delay until the regular daily delivery would obviate any extra and double use of the main tracks for this car alone, and the contention would have been at least as forceful as that now made.

Upon the whole case, we conclude that the Louisville Company correctly interpreted its statutory duty.

The judgment is affirmed.