### UNITED STATES v. CHESAPEAKE & O. RY. CO.

#### (District Court, E. D. Kentucky.    October 14, 1916.)

#### No. 2980.

RAILROADS ☞229—SAFETY APPLIANCE ACT—CONSTRUCTION.

Safety Appliance Act April 14, 1910, c. 160, § 4, 36 Stat. 299 (Comp. St. 1913, § 8621), which provides that a car properly equipped, which has become defective or insecure while in use, "may be hauled from the place where such equipment was first discovered to be defective or insecure to the nearest available point where such car can be repaired," without liability for the penalties imposed, does not permit a railroad company to move, without penalty, from one point to another, a defective car, not known to be defective, and which is not so moved for the purpose of repair, although in fact it is hauled to the nearest available point for repair, and is there repaired.

[Ed. Note.—For other cases, see Railroads, Cent. Dig. § 743.]

At Law. Action by the United States against the Chesapeake & Ohio Railway Company. On demurrer to certain paragraphs of the answer. Demurrer sustained.

Thos. D. Slattery, U. S. Dist. Atty., of Covington, Ky., for United States.

Galvin & Galvin, of Cincinnati, Ohio, for defendant.

COCHRAN, District Judge. This cause is before me on plaintiff's demurrer to defendant's answer to the third, fourth, fifth, sixth, seventh, eighth, ninth, tenth, eleventh, and thirteenth paragraphs of the petition. It is a prosecution under the Safety Appliance Act. The violation charged in each of these paragraphs is the hauling from Covington, Ky., toward Silver Grove, Ky., about 10 miles away, of an interstate car with a defective coupling apparatus. The answer presents the same defense to each of these paragraphs. That defense is that each of the cars was received from a connecting railway at Cincinnati, Ohio, just north of Covington, to be hauled to Silver Grove, a terminal on defendant's road and where it maintained its yard; that it was in a safe and proper condition when it left Cincinnati; that defendant had no inspectors or repairmen and made no inspections or repairs at Covington; that it had inspectors, repairmen, and all the facilities for making repairs at Silver Grove; that the defect complained of was discovered and repaired at that point; and that Silver Grove was the first point at which such repairs could have been made after the defect occurred and the discovery thereof. It is not alleged that

the defect was discovered at Covington and the car hauled to Silver Grove to be repaired. Indeed, the implication, if not admission, is that it was not discovered until the car reached Silver Grove. The case presented by the answer, therefore, is this: The defect arose between Cincinnati and Covington, after defendant began to haul the car; it hauled the car in its defective condition from Covington to Silver Grove; it did not discover the defect until the car reached Silver Grove; and no provision had been made by it at Covington, or, for that matter, at any point between Covington and Silver Grove, for discovering the defect.

Beyond question, under the Safety Appliance Act as it stood before the amendment of April 14, 1910, the haulings of these cars were violations thereof. According to the construction placed on the act by the Supreme Court, though a defect arose from no fault of the railroad company, and though it was ignorant thereof and in no fault in not discovering it, if the railroad company hauled it any distance for any purpose, it violated the act. The amendment was enacted to relieve the statute of, at least, some of its absoluteness. The question is: To what extent it did so. It provides that, in case the coupling apparatus becomes defective whilst the car is being used, it "may be hauled from the place where such equipment was first discovered to be defective or insecure to the nearest available point where such car can be repaired." It will be noted that the only hauling of a defectively equipped car which the amendment permits is from the place where the defective condition was first discovered to the nearest repair point, and, as it has been construed, then only for the purpose of repair. It says nothing about hauling such car before such discovery. Possibly there is room to say that it did not occur to the amendment, if we may personify it, that there would be any violation of the act if it was hauled before discovery, at least if there was no fault on the part of the railroad company in not discovering it sooner, and, even more than this, to wit, that it is the presupposition of the amendment that there would be no violation in such a case. It would seem to be just as harsh to punish a railroad company for hauling a defective car, when it was not at fault in discovering its condition, as for hauling it after discovery to a repair point for repairs, when it could not be repaired at the place of discovery. If the permission of the amendment is limited to the latter hauling, what we have then is this: If a car becomes defective out on the road at a point where it cannot be repaired, and it is at once discovered, there is no violation of the act in hauling the car to the nearest point for repairs; but if it is not discovered there is a violation in hauling the car from that point thereto, though there may be no fault in not discovering it before reaching such point, and it is discovered and repaired thereat.

The decisions of the federal courts which have had to deal with this question, however, go far toward holding, if they have not actually held, that the amendment goes no further. The reasoning upon which this position is based is that, as under the original act, any hauling of a defectively equipped car was a violation thereof, and the amendment only permits hauling of such a car after the discovery to the nearest repair point for repairs, any other hauling and hence a hauling before

discovery, though without fault, in not discovering, is a violation thereof. In the case of C., B. & Q. R. R. v. United States, 211 Fed. 12, 127 C. C. A. 438, a decision of the appellate court of the Eighth circuit, a car was received by the defendant from the Atchison, Topeka & Santa Fé Railroad Co., at Kansas City, Mo. The defendant has a yard therein known as the "Twelfth Street yard." Whether the car was received at this point does not clearly appear. But before it received the car it was inspected and found to be in proper condition, and it was hauled by defendant from that yard across the Missouri river, over its bridge and main line, to its Murray Street yard. When it reached there the defendant for the first time discovered that the coupling appliance was out of repair. It was held that, if the car was in a defective condition in the Twelfth Street yard, there was a violation of the act, notwithstanding it was not discovered until it reached the Murray Street yard. The decision was based on two reasons— that the defect was of such a character that it could have been repaired at the Twelfth Street yard, and the car was not hauled to the Murray Street yard for repairs. Possibly, if the car was defective whilst in the Twelfth Street yard, defendant was not without fault in not discovering it there; and it is to be noted that the lower court instructed the jury that, if the defect arose whilst the car was in transit between the two yards, there was no violation of the act.

In the case of United States v. Trinity & B. V. R. Co., 211 Fed. 448, 128 C. C. A. 120, a decision of the appellate court of the Fifth circuit, a car was hauled from Tom Ball, through Houston, to Galveston. It was hauled from Houston in a defective condition. It was inspected at Tom Ball and found to be in good condition. Defendant had no inspectors or repair shops at Houston, but did have them at Galveston. It did not discover the defective car until it reached Galveston. Houston was a few hours' run from Tom Ball and Galveston a few hours' run from Houston. It was held that the defendant was liable. It was stressed, however, that it was not shown that the hauling to Galveston was necessary to repair the defect, and it could not have been repaired, except there. Judge Call said:

"Bear in mind that under the Safety Appliance Act of 1893 (Act March 2, 1893, c. 196, 27 Stat. 531 [Comp. St. 1916, §§ 8605–8612]), and the amendments, ignorance of defects does not excuse. The duty to have and maintain in good order the safety appliances required is a positive duty imposed on the carrier, * * * and that the defendant in the instant case seeks to avoid responsibility for the violation of this duty by pleading the proviso of the act of 1910. By all the canons of construction, it must clearly bring itself within the terms of the proviso before it can demand immunity."

The case of United States v. Chesapeake & Ohio Ry. Co., 213 Fed. 748, 130 C. C. A. 262, a decision of the appellate court from the Fourth circuit is not in point. The case came within the express terms of the amendment. The question was whether certain hauling after the discovery of the defective condition was permitted thereby. A statement in Judge Pritchard's opinion as to the purpose of the amendment may be quoted. It is:

"Any movement of a defective car was held to be a violation of the act as originally passed. It was undoubtedly the purpose of Congress in adopting

the amendment of 1910 to somewhat relax the rigid rule which had theretofore been announced as to the time within which repairs of defective cars should be made."

The case of Chesapeake & Ohio Ry. Co. v. United States, 226 Fed. 683, 141 C. C. A. 439, another decision of the appellate court of the Fourth circuit, is most in point of all the cases cited as bearing on the question here. The car in question was brought by a train into Fulton Street yard in Richmond, Va. It was hauled from there to the Second Street yard, and from there to a siding in the Ninth Street yard to be unloaded. Inspectors were maintained at the Fulton Street yard and Ninth Street yard, but not at the Second Street yard. It was inspected at the Fulton Street yard and found in good condition, and again at the Ninth Street yard and found to be in bad condition. It was in fact defective when in the Second Street yard, and hauled from there to the Ninth Street yard. It was held that defendant was liable, notwithstanding it was ignorant of the defective condition of the car at the time it was so hauled, and there was no intimation that it was thought that defendant was in fault in not discovering it sooner. Judge Knapp said:

"Without multiplying citations, it is sufficient to say that the original act as construed by the courts made the carrier liable for any and every movement on its line, in interstate commerce, of a car whose coupling apparatus was out of order. Under no circumstances could such a car be hauled or used without violating the statute; and the penalty was incurred, when a car was moved in a defective condition, even if the carrier had been vigilant to discover the defect and was actually unaware of its existence. Indeed, it was the severity of this absolute prohibition, which did not exempt the necessary movement to a repair shop, that led to the remedial amendment above quoted. But the relief thereby granted is limited by its express terms and manifest intent, and there is no warrant for its further extension. It permits the transfer without penalty of a disabled car to 'the nearest available point' where it can be repaired, provided such transfer is necessary because the defects cannot be remedied at the point where they are first discovered, and that is the only movement which does not subject the carrier to liability."

In view of these decisions, I cannot see my way clear to uphold the defense, and hence must sustain the demurrer.